DALE REBMANN, Appellee, v. CLAUS H. HEESCH, Appellant.

No. 44943.

NOVEMBER 21, 1939.

Helsell, Burnquist & Bradshaw, for appellee.

Hallagan, Fountain, Stewart & Cless, and Price, Rider & Keefe, for appellant.

BLISS, J.—The injury and negligence complained of occurred on a highway paving project in the city of Fort Dodge. The Sani Construction Co. was engaged in building a concrete paved highway, somewhat over 300 feet long, connecting 8th street and primary Highway No. 20, and being the hypotenuse of an approximate right angled triangle formed by the three highways. At this place, Highway 20 extends approximately east and west, 8th street, north and south, and the street, under construction, extended from northeast to southwest.

The following outline, though not drawn to a scale, and not an exhibit in the case, fairly sketches the situation, as we read the record:

■ I. The plaintiff was injured, while at work preparing the roadbed for the concrete, when the defendant, in backing his truck to the paving machine, struck and injured him. Plaintiff alleged a number of grounds of negligence, of which the following were submitted to the jury, to wit:

1. That defendant at said time and place backed his truck up on the right-hand side of the road or highway where men were working at a place where it would prove dangerous to working men whereas the usual and ordinary place of backing said truck was at the left-hand side of said road where no men were working.

2. That defendant at said time and place backed his truck over and upon the plaintiff without sounding any horn, whistle or bell announcing the approach of said truck to this plaintiff or others working in said place.

3. That defendant at said time and place was backing his truck without looking or observing the presence of this plaintiff or other persons in the path in which he was going.

The construction of the paving was proceeding northeasterly from Highway 20 to 8th street. The concrete slab was twenty feet wide. The concrete mixer was of the Koehring make. A caterpillar tractor carrying the mixer. On the receiving end of the machine was a scoop on which the trucks carrying the dry mix backed and dumped their loads. The scoop was then elevated dumping the batch into the mixer, from which the wet mix passed into a bucket on a traveling arm, at the rear, and was poured to form the green slab.

The plaintiff, a young man twenty-one years old, was a WPA laborer working with a gang of men engaged in placing the steel side forms for the slab, and in preparing the dirt roadbed ahead of the mixer. The latter work consisted in cutting down the elevations and bumps, and filling the depressions, so as to bring the roadbed to the proper grade, and smooth its surface. The roadbed had a six per cent grade toward Highway 20. A tractor grader was used to cut down the elevations and at the same time fill the depressions. And a caterpillar tractor with a scoop or scraper, described as a tumbling bug, was used to transport dirt from the borrow pit, and dump it in piles on the roadbed where it was necessary to raise the grade. In addition to the two men who operated the grader and the tumbling

bug, there were four or five men engaging in placing the forms at the sides, and in leveling the dirt. This gang went to work at 5 o'clock in the morning so as to have sufficient roadbed prepared for the mixing crew, and the truckers, who started their operations about 10 o'clock in the forenoon. It was the practice of the grading gang to have one half of the roadbed prepared a considerable distance farther in advance of the other half, so that the truckers, who hauled the dry mix of cement, sand and gravel, or stone, would have a smoother road, and one less impeded by the grading gang, in getting to the mixing machine. On Thursday, May 26, 1938, the grading gang had placed the steel side forms for the west side of the slab, and filled and tamped the dirt about them, and filled and graded the west side of the roadbed, almost to the opening into the west side of 8th street. It was also the practice of the road gang to keep the entire width of the roadbed prepared and ready for the pouring of concrete thereon, for a distance of at least 25 feet ahead of the mixer. This was the condition on Thursday. The steel side forms had not all been placed for the east side of the slab. They had been laid only about 20 feet from the mixer. At about 3:30 o'clock in the afternoon, the plaintiff was engaged in grading the surface of the ground, for the width of about a foot, on the east line, where the form was to be placed, so as to leave a distance of 8 inches between the surface of the ground and a cord which was stretched at the elevation of the top of the form. The tumble bug had dumped several piles of dirt on the east half of the roadway. The plaintiff was working along the east side, about 30 or 40 feet from where the trucks backed off of 8th street on to the dirt surface of the new roadway. He was shoveling the freshly dumped dirt over onto the ground under the cord. He was standing, stooped over, about a foot inside of where the form was to be placed, using a short shovel, facing south, when the defendant, an independent trucker, backing his Chevrolet truck, loaded with 5400 pounds of the dry concrete mix, struck him and knocked him down, and ran over the length of his left leg, and his pelvis, with the right rear dual tire of the truck.

The truckers, who were eight or nine in number, hauled the dry concrete ingredients, from the loading set up, about a

mile away. They came north on 8th street, through the pass under Highway 20, to the opening of the new street and then backed their trucks, southwesterly to the paving machine. There is little dispute as to the location of the plaintiff when he was struck. No one saw the contact except Hood, the foreman of the leveling gang, who was standing about 20 feet south of plaintiff in the center of the roadway. He testified that plaintiff was about 30 or 40 feet from 8th street, and lay about 5 feet west of the east line, after he was struck. Robert Jones, a co-laborer of plaintiff, who was also shoveling dirt about 20 feet south of plaintiff, and who did not see the blow, and did not see nor hear the approach of the truck, said that just before he was struck, plaintiff was standing a foot or two west of the east line, about 30 or 40 feet from 8th street. No other witness testified on this point. The defendant admitted that he was backing the truck on the east side of the roadway, but said he did so to avoid the grader and other vehicles.

The defendant testified:

"Well when I come up 8th street, and when I got up 8th street there was a gap to come in where they was working, and I pulled in towards the north and then headed back with the truck towards the mixer, and on the west side there was a grader setting there, they call it a blade, I had to back over to the east side to get around here. A little bit further up here towards the mixer sat a service truck with a big wide flat box on it they hauled with, and that you had to watch, and there were two or three trucks up by the mixer, and that afternoon sometimes there was a tumbling bug in there, and at times we would have to stop and sit there in the road. I had to go over to the west side after I got around this machine [the grader], and when I went back ten or fifteen feet further, I had been standing on the running board so I could see."

There is little, if any, corroboration for this testimony, respecting conditions at the time of the injury. No trucker testified that he was on this roadway at the time of the collision. Three of them testified for the defendant. The trucker, Glenn, testified:

"I don't think this mortar blade or scraper was being used that afternoon. Everytime the mixer was moved, it was moved

too. I think it was standing that afternoon between the forms. I couldn't say where it was standing. It was standing between the mixer and 8th street. I couldn't say whether it was halfway between the mixer and 8th street or nearer 8th street or the mixer.''

Defendant's testimony that he went on the east side to avoid the grader was much weakened on cross-examination, which shows that he never saw the grader until after he had run over plaintiff. This was his testimony:

''Q. How many things did you see as you backed up there? A. Why there was a grader that I backed around in the first place.

''Q. Where did you back around that? A. Just before I hit Rebmann. I take that back, just before I see Rebmann.

''Q. Well did you see Rebmann before you hit him? A. No, sir.

''Q. Well then when did you see the grader? A. *I seen the grader just before they hollered for me to stop.*''

And it appears that ''they hollered'' two times before he stopped, for he further testified:

''And the first thing I knew somebody hollered, *and they hollered again and I stopped to see what was wrong.* I did not get out of my cab then. I opened the right hand side door and looked out and found a man lying right along side the running board.''

With respect to the use of the road between the mixer and 8th street at the time plaintiff was struck, his foreman, Hood, testified:

''All the time they were hauling cement and mixing batch, they are preparing the grade, the dirt there for the approach of the mixer, and there were men working all up and down the job there, all the way from where the forms first started clear up to the mixer. Right at that time I don't know whether there was other trucks in there or not. I know the tumbling bug was not there at that particular time because it was out in the borrow pit, and was not there at the time he was hurt. The scraper wouldn't be there if the tumbling bug wasn't, it had

just gone out, it had just dumped the dirt they were leveling there, some fresh dirt, and it was that fresh dirt that Rebmann was spreading out. And that was on the east side, and there was somewheres about four or five men working at leveling there, I don't know just how many there was that day. I don't think they were all working on the dirt. Some were working on forms. I don't believe there was over two of them in the one pile of dirt, just Rebmann and another boy, I think. I think the east side was lower than the west side in that particular spot, and I think we had dumped a lot of fresh dirt from where the mixer was all the way down. The trucks could have backed up over the dirt, but we didn't like to have them do it. If they could get around the piles of loose dirt, they were really supposed to go around.''

Robert Jones, for plaintiff, testified:

''We did not work on the west side that afternoon because the truck was there.''

Respecting the location of the grader, at the time plaintiff was hit, which was opposed to what defendant said, he testified:

''I said there was a blade [grader] on the other side of the road. It was up north of us there where we just took out the old pavement the day before. It was on the north side, north of where that approach on 8th street, where the old pavement was, we didn't have it graded yet, we had to have some high bumps taken off. * * * *It wasn't where the trucks came.* It was on west and north side. The grader was on the west and north side. The grader was on the west side of the road, and it was away north of us. *The grader was way north of where the trucks got into the road.''*

With respect to the side of the road on which the defendant and the other truckers had backed their loaded trucks to the mixer on Thursday, Jones testified:

''The dirt was on the east side of the road that afternoon. The tumbling bug dumped it in the morning, it was just in piles, and that continued up until about twenty five feet from the front of the mixer. Defendant backed up the east side where we were. * * * *Previously that day, the trucks before*

*the one that Heesch was driving came, had gone on the opposite*
*side of the road from where we were, the west side.*

"Q. *Where had all the trucks gone before the Heesch*
*truck came?* A. *The same side, the west side.*"

On this issue, Hood testified:

"I think on this particular day, we were building up on
the east side. We generally take one side there and bring it
down probably fifty feet and go over to the west side.

"Q. *But had the trucks backed up on the west side?* A.
*They had been.* * * * I imagine there would be some dirt
thrown out in the center, but I know we dumped the dirt prac-
tically on the east side. * * * I know this particular batch of
dirt that he [Rebmann] was working on was on the east side,
because I was right there when it happened. * * * I imagine
the truck was 30 or 40 feet from Rebmann. * * * If there was
other machinery in the way, the truckers would have to seek
their way to the mixer."

With respect to the side of the road being used by the
loaded trucks, the plaintiff testified:

"On Monday, before I was hurt, they were just starting [the
paving] from the highway going northeast. We didn't get started
laying concrete until about 10 o'clock in the morning on Monday.
* * * It rained Tuesday, and Wednesday. I worked ahead of the
mixer. * * * I first worked on the west side. * * * On Monday,
we got down there about fifty or sixty feet ahead of the mixer
before the trucks started working, then we laid the forms on the
west side before we laid them on the east side, and we laid them
all on the west side all the way up just about to the end where
they were going to pave. * * * There had been trucks going up
within those forms, or within the west form and where I was
working, before that day. *These trucks went on the west side,*
*no trucks had gone up on the east side until Heesch came along.*
Those trucks prior to the Heesch truck coming up there with
anybody in the way would blow their horn, and that was the
practice of all of them. * * * I didn't have any knowledge of
the approach of this truck at all before it hit me. * * * I didn't
have any information or sound of any kind that would tell me
that any truck was coming up the east side of that road. * * *

"Q. *Had any car driven near the place where you were*

*working before you were hit?* A. *No. No car had driven before that day anywheres near where I was working.*

"Q. *Was there a path or beaten path of the trucks on any part of that road?* A. *The west side of the road.*

"Q. *Yes, did you have any idea that any car was going to come anywheres near where you were working?* A. *No.*"

Corroborating the testimony for appellee, that the trucks had used the west side in backing in, is the testimony of the defendant:

"*We always backed up along the west and when we got up close to the mixer,* let the empty trucks out and then we would back over to the middle to back into the scoop. * * * They most generally came out on the east side, *and we backed in on the west side.*"

Defendant's witness, the trucker, Rose, also testified:

"The way I recollect it, is that as a general rule the loaded trucks tried to back on the west side with the left hand door open so they could watch the form and keep far enough away so they wouldn't knock it out of line, and of course now and then there might be machinery there at different intervals that we had to back around."

On the issue of the failure of the defendant to sound a horn or to give any signal, no contest was made by the defendant. He testified that he did not sound the horn of the truck. It was his contention that it was not customary for the truckers to sound the horns in operating their trucks on the road being constructed. Some of the other truckers so testified. One of them testified that they blew their horns if they thought some one was in danger. He said that the other truckers never blew a horn while he was around there. The defendant said that if they did it would sound like a music box around there. Defendant's counsel also contended that under section 264 of chapter 134 of the Acts of the Forty-seventh General Assembly, the defendant was exempted from using a horn on the road under construction.

On the issue of failure to keep a proper lookout, the defendant claimed that in backing his truck he held the left door open with his left arm, and looked backward out of the open

door, and guided the truck with his right hand, and that it was impossible to see anyone to the right and rear of the truck unless he was back a considerable distance. The top of defendant's cab was two feet higher than the top of the box of the truck. It was also his contention that it was the duty of the ground levelers and their foreman to look out for their own safety, and to keep out of the way of the trucks. Some of the truckers testified to the same effect. One of them testified that: "You can't look back because it takes time."

The plaintiff and the other ground workers were in plain view of the defendant and the other truckers, as they came north on 8th street to the place where they stopped to back into the new road. Plaintiff was working but 30 or 40 feet away as the defendant drove by, stopped and began backing. The testimony of defendant and his trucker witnesses was that the driver of a truck could not see anyone to his right and rear when backing. If it be conceded as true, yet this did not excuse the defendant from looking and seeing the plaintiff before he began to back, and when the plaintiff was approximately twice the length of the truck from him. Knowing the difficulties of seeing anyone to his right rear, defendant should have used ordinary care to look and see whether anyone was there, before he began the operation of backing, when there was nothing to interfere with his looking and seeing. It is true the plaintiff could also see the defendant, and he admits that he did not pay any attention to the trucks as they came north on 8th street, while working on the east side. Under the record made there were no reasonable grounds for his doing so. Under the plan and practice of the work, the truckers were supposed to, and had been backing their loaded trucks on the west side of the roadway, and the plaintiff had no reason to believe that the defendant would violate this plan and practice. No notice, warning or signal of any kind was given by the defendant that he would back up on the east side. Defendant said:

"I could have seen him if I had looked, my eyes are good."

But there is no evidence that he did look at the time and place, when and where, he could have seen, and warned, and avoided injuring the plaintiff. If it be conceded that defendant's contention is sound that section 264 of chapter 134 of the Acts of the Forty-seventh General Assembly exempted him

from using the horn on the truck while on the road under construction, which contention we do not concede, it did not exempt him from such use of the horn, while he was on 8th street, a *highway in use,* from which he was in the act of backing, if ordinary care required him to so do under the circumstances.

While said section does exempt those referred to therein, from certain requirements specified in the chapter, it does not release such persons from the use of ordinary care nor absolve them from their negligence, nor was it ever, in our judgment, so intended by the legislature. If under the facts in this case, ordinary care required the defendant to sound his horn, while working on this road under construction, or to give some warning to the plaintiff, said section 264 will not excuse his failure to do so.

The appellant relies strongly upon the decision in Hedberg v. Lester, 222 Iowa 1025, 270 N. W. 447. Because of the different fact situation in each case, the decision in the Hedberg case is not controlling here. The position in which Hedberg placed himself put him in a position of extreme danger. Loaded trucks were backing in on the east side of the road, at the rate of one every 90 seconds, and they were returning at approximately the same rate. The trucks were $6\frac{1}{2}$ feet wide. Plaintiff had instructed them to keep at least one foot from the side forms. The roadway was 18 feet wide. Allowing 13 feet for the trucks and 2 feet for form clearance, the maximum clearance between the trucks would be 3 feet, a precariously narrow pathway for an adult to walk. He was moving in a zone where the hazard of injury was continuously changing. Hedberg had formulated these rules. Knowing all the conditions he had walked 200 feet, without once looking back, but a short distance west of an unmarked center line. In the present case three witnesses testified that the trucks backed in about one every 10 or 15 minutes. There was no direct evidence to the contrary, although, by computation, the defendant seeks to refute this. The roadway was 20 feet wide. The plaintiff was working under instructions of his foreman, at the place where he was told to work. He was at the outside edge of the road, in a place of reasonable safety, under the plan and practice of the work. The question of his contributory negligence was for the jury. Under the record there was evidence to justify both the submission

of the three grounds of negligence alleged, to the jury, and to support its verdict.

II.   Instruction 5 was as follows:

"The first charge of negligence against the defendant, as I have said, is that he was backing his truck without looking or observing the presence of plaintiff in the path of his moving truck.   I need scarcely say that in moving a truck where men are at work, it is ordinarily the duty of the operator to keep a lookout in the direction in which his truck is moving, and to take note of any persons or other discernible objects in the path of his moving vehicle, if any; his duty in this respect being to exercise such reasonable observation and lookout in the direction in which he is moving, and such reasonable precautions, as a person of ordinary care and prudence would exercise under like circumstances.   *If he discovers, or in the exercise of reasonable care should have discovered, a person in the path of his moving vehicle, it is his duty to exercise the care and caution of an ordinarily prudent person to bring his vehicle under proper control and take appropriate care to avoid a collision, even, if necessary, to bring his vehicle to a complete stop. An operator's duty in this respect, as I have said, is measured by the care you would expect from an ordinarily careful person under the same or like circumstances.*

"In this case if you find from a preponderance of the evidence that at and immediately before the accident in question defendant failed to keep a reasonable lookout in the direction in which he was moving his truck, and failed to exercise such powers of observation and such precautions in that respect as a reasonably careful person under like circumstances would have taken to have observed the plight of plaintiff at work in the path of his backward moving truck, then you have a right to find that he was remiss in his duty and was guilty of negligence as thus charged in the petition."

Defendant complains that the italicized portion of the instruction submits an allegation of the petition, that defendant did not have his truck under control, which issue had been withdrawn from the jury, and also submits general negligence.   This criticism is not warranted, in our judgment.   The court was instructing upon the duty of one, in the situation of the defen-

dant, to use reasonable care to watch for and discover any one in the pathway of his vehicle, and upon discovering him to use reasonable care in the operation of the vehicle to avoid injuring him. The duty of keeping a proper lookout includes not only using reasonable and ordinary care to discover the person in danger, but also reasonable care in the operation of the vehicle to avoid injuring him. The instruction did no more than this, and did not inject into the case an issue that the defendant did not have his truck under control, nor did it permit the jury to speculate on negligence generally.

In discussing the phrases ''proper lookout'', or ''keeping a lookout'', speaking through Justice Hamilton, in Pazen v. Des Moines Transportation Co., 223 Iowa 23, 30, 272 N. W. 126, 130, the court said:

''It implies being watchful of the movements of his own vehicle as well as the movements of the thing seen. It involves the care, prudence, watchfulness and attention of an ordinarily careful and prudent person under the circumstances. * * * A proper lookout called upon the driver of each of these trucks to exercise that degree of care that an ordinarily prudent person would exercise, to ascertain where he was driving with reference to the middle of the pavement, and also with reference to the position of the other vehicle approaching, and to govern his speed in such a way as to be able to keep his machine under control and upon his proper side of the pavement, in order to avoid a collision.''

Defendant has assigned some other errors pertaining to the instructions. We have carefully studied these, but find no error. The judgment appealed from is therefore affirmed.—Affirmed.

OLIVER, C. J., and HALE, SAGER, HAMILTON, STIGER, MITCHELL, and RICHARDS, JJ., concur.