# BENNIE E. SWANSON v. J. L. SHIELY COMPANY AND STEENBERG CONSTRUCTION COMPANY.[1]

July 27, 1951.

Nos. 35,422, 35,423.

---

[1]Reported in 48 N. W. (2d) 848.

*Cummins, Cummins & Hammond,* for appellant J. L. Shiely Company.

*Freeman, King, Larson & Peterson* and *Robert L. Hoppe,* for appellant Steenberg Construction Company.

*Sullivan, Stringer, Donnelly & Sharood,* for respondent.

LORING, CHIEF JUSTICE.

This is an action in tort brought initially against the J. L. Shiely Company to recover damages for personal injuries. On motion of the J. L. Shiely Company, the trial court ordered that the Steenberg Construction Company be made a party defendant. This action came on for trial before a jury, which returned a verdict against both defendants and assessed plaintiff's damages at the sum of $40,000. Each defendant moved for judgment notwithstanding the verdict or a new trial, and these motions were, in all respects, denied. Each defendant has appealed from the order denying its motion.

Plaintiff, Bennie E. Swanson, is a carpenter and an employe of the Raymer Hardware Company, a corporation, engaged in the sale, installation, and servicing of overhead doors.

Defendant J. L. Shiely Company is a corporation engaged in the business of manufacturing, producing, and delivering by motor

truck mixed or poured concrete to construction projects. Defendant Steenberg Construction Company is a corporation engaged in general building construction work. At the time herein material, the Steenberg Construction Company was engaged in the construction of a new building in extension of the existing plant of the Merchants Motor Freight, Inc., a corporation, conducting a business as motor carrier of goods and merchandise. For convenience of reference, plaintiff and the corporations described above will be referred to respectively as "Swanson," "Raymer," "Shiely," "Steenberg," and "Merchants."

At the time here involved, Merchants had a warehouse located on Territorial Road and Eustis avenue in the city of St. Paul. The warehouse was 159 feet long, running east and west. A loading dock, which was approximately 3½ feet high, extended along the southern side of the warehouse. There was a distance of 50 feet between the loading dock and the north wall of the warehouse, so that for the purposes of this appeal the floor of the warehouse may be regarded as 159 feet long and 50 feet wide. At the time plaintiff received the injuries sued upon, there were four large entrances to the warehouse. Two of them, each 14 feet wide, were on the north side of the warehouse. Another one was at the west end of the warehouse. At the east end, there was a doorway 16 feet wide which led from the old warehouse into the new section that was being constructed at the east end of Merchants' old warehouse by defendant Steenberg. This doorway was not identified by any letter or figure on the plat or in the evidence, but, for convenience, we shall call it door "A." The addition being built extended at least 20 feet north of the old warehouse and had another door 16 feet wide leading into it from the space north of the old warehouse. For convenience, this doorway will be referred to as door "W2." It has been so designated on the plat introduced in evidence. Immediately to the south of door W2 and between the old warehouse and the new construction is the 16-foot doorway, referred to above as located at the east end of the old warehouse. The distance between door A and the easternmost 14-foot entrance on the north side of the

old warehouse was 74½ feet. This easternmost entrance on the north side of the old warehouse has not been identified by letter or figure in the record or on the plat, but it was while removing the overhead door from this entrance that plaintiff was injured. The westernmost of the two doors on the north side of the warehouse was about ten feet west of the other north-side door. It was not properly identified in the record. Counsel on both sides, while witnesses were testifying with reference to the plat, frequently referred to points on the plat as "here," without other identification. This is very confusing to an appellate court. Moreover, the plat referred to was, as the trial court said, "upside down"—north being at the bottom of the plat, which, obviously, was confusing to the witnesses as well as to everybody else.

Steenberg's contract with Merchants called for the construction of the new addition to the east end of Merchants' warehouse and for closing up the two entrances on the north side thereof. By verbal contract with Raymer, Steenberg arranged to have Raymer dismantle the two overhead doors which operated in the two entrances on the north side of the warehouse.

Shiely had an order from Steenberg to deliver mixed concrete to Merchants' warehouse to be used in laying a concrete floor in the new construction. Shiely delivered the mixed concrete to Steenberg by means of an agitator type of motor truck, which is a truck with a power-driven concrete mixer mounted on its body. It was so arranged as to permit the load of ready-mixed concrete to be emptied onto any spot where the concrete was desired to be used.

August 23, 1948, the day Swanson was injured, Raymer dispatched two of its employes, Swanson and Elmer J. Wegner, to Merchants' warehouse for the purpose of removing the two overhead doors on the north side of the warehouse. Swanson was in charge of the operation. They arrived about 8:30 a. m., parked their truck at the easternmost of the two doors on the north wall, and proceeded with the work of removing that door. In doing this work, Swanson and Wegner used straight extension ladders. Wegner's ladder was placed against the north wall with the foot of the

ladder about four feet out from the wall. Swanson's ladder was placed so that it faced east, or toward the new construction, with its top resting against a crossbeam, which apparently ran north and south across the top of the old warehouse. The foot of Swanson's ladder was about four or five feet south of the north wall and west of the crossbeam on which the top of the ladder rested, so that the two ladders overlapped at their bases. Swanson and Wegner commenced work on the easternmost door on the north side, which was about 14 feet high, and at the time of the accident both men were on their ladders about 13 or 14 feet above the floor of the warehouse. They started working on these ladders about 9 or 9:15 a. m.

On the day of the accident and prior to its occurrence, Joseph Roach, the driver of the Shiely truck involved in the accident, had delivered three loads of mixed concrete to the warehouse. On his fourth trip, made about 11:15 a. m., Roach testified that he drove to the north side of the building and found that Frank Ferretti, Steenberg's foreman on the construction project, had changed the routing of the inbound Shiely trucks. Ferretti told Roach to drive into the old warehouse through the westernmost door on the north side and back up to door A from there. As instructed, Roach turned through the designated entrance and then to the right or west, so that when he was through the door he was facing west with his truck in a position to back toward door A, leading from the old warehouse into the new building, where he was to deliver the load. In this position, his truck was or should have been approximately parallel with the north wall and about seven feet from it.

There is evidence in the record tending to prove that Ferretti directed Roach in backing and that Ferretti walked along near the left rear wheel of the truck and gave hand signals to Roach while he was backing the truck. While they were so engaged, Roach permitted the rear of his truck to swing out of the direct route toward door A and toward the north wall. It hit the ladders and knocked them down. Swanson was knocked to the concrete floor, falling about 14 feet. When Roach stopped his truck in response

to an outcry from someone, it was standing with its rear several feet nearer the north wall than was the front. Swanson was lying at least partly under the truck. He received two fractures of the pelvis at the pubis point and a compression fracture of the second lumbar vertebra. The lumbar region was flattened. The lumbar curve is not now present. The second lumbar vertebra is prominent and protrudes. The range of motion of the back has been restricted 25 percent. The straight-leg raising of the right leg has been lessened slightly, and Swanson complains of some numbness of the leg. He has a limp. He suffered severe pain for extended periods of time and will not be able to lift the heavy loads necessary to be lifted in installing overhead doors, which was his line of carpentry work. These injuries have left him with permanent disabilities which materially reduce his earning capacity.

■ There is ample evidence of negligence on the part of both defendants and of such negligence having contributed proximately to plaintiff's injury.

■ Each defendant has set up the defense that a tort action will not lie against it for the reason that all parties to the action are admitted to be subject to the workmen's compensation act. They contend that they were engaged in the due course of business in furtherance of a common enterprise or in the accomplishment of the same or related purposes in operation on the premises when the injury was received at the time thereof within the provisions of L. 1921, c. 82, § 31(1), as amended by L. 1923, c. 279 (M. S. A. 176.06, subd. 1).

The principal questions presented by these appeals are whether the defenses pleaded by defendants are available to them in the light of the construction placed upon L. 1923, c. 279, by this court. Words may be clear in their ordinary meaning; but, when applied to a context such as the workmen's compensation act, they may be doubtful in application and, as in the case of this amendment, may lead to much litigation to determine their proper interpretation when applied to the context. That is what has happened to the 1923 amendment. It has given rise to "endless and fruitless litiga-

tion." As applied to the compensation act, the words employed by the legislature are indefinite and doubtful in meaning. They have been so adjudicated. Gleason v. Geary, 214 Minn. 499, 506, 8 N. W. (2d) 808, 812; Tevoght v. Polson, 205 Minn. 252, 285 N. W. 893. In the Gleason case, this court reviewed the history of legislation from the enactment of the first workmen's compensation act in 1913 to the repeal of that act in 1921, the enactment of the 1921 act, and the amendment in 1923, now under consideration. We also reviewed the cases subsequent to 1923 in which we had tried to discover the legislative intent of the amendment. We therefore approach the solution of the questions presented, not as to a case of first impression, but by applying to the problem the interpretation which this court has previously spelled out of the vague, doubtful, and, as applied to the compensation act, indefinite legislative language in an endeavor to "interpret the language in the light of the purpose and intent of the act." 214 Minn. 510, 8 N. W. (2d) 813. To do otherwise now and to give a different interpretation to it would be to subject the court to merited criticism that its opinions were good only for the day and case. Our opinions are not only a guide to the lower courts and binding upon them, but the law of this state is what we say it is when the federal courts are called upon to interpret and apply it. Therefore, we should be consistent in our construction of our laws. Our decisions should establish stable interpretation, especially as to legislative intent. Our interpretation of the 1923 amendment, as finally arrived at in Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808, has been in effect since March 1943. The legislature was then in session, and it has since had four regular sessions. In none of those sessions has it redrafted or amended the language of the 1923 amendment as so interpreted by us. It is significant that the legislature in 1923, realizing the injustice to employes that had been done by L. 1921, c. 82, § 31, in protecting employers who were subject to the act from tort actions by employes of other employers who were subject to the act, promptly sought by L. 1923, c. 279, to limit that protection by excluding certain employers from the protection of the act and per-

mitting their employes to recover in tort actions without restriction as to amount against third parties even when such third parties were subject to the act. Since the 1923 amendment was plainly intended for the benefit of employes, it should be liberally construed with this purpose and intent in mind. We think we may safely say that in the Gleason case, *supra,* we correctly interpreted the legislative intent. In that case, after reviewing the legislation and its interpretation by this court, we said (214 Minn. 508, 8 N. W. [2d] 812):

"Unquestionably the legislative purpose was to enlarge the rights and remedies of the injured workman. His employer, under the original act, was well taken care of, and these rights under the second subdivision of the amended act were retained for him. He has lost nothing by the change. Since it was the injured workman the legislature sought to help, we should now say without equivocation that (205 Minn. 254, 285 N. W. 894) the legislature 'intended that his common-law right of action should only be eliminated in situations like those where' several employers 'are engaged on the same project and their employes exposed to the [same or similar] hazards created by such mutual engagements.'"

We went on to quote with approval from the views of Mr. Justice Pirsig in his concurring opinion in Gentle v. Northern States Power Co. 213 Minn. 231, 237, 6 N. W. (2d) 361, 364, where he said:

"Undoubtedly, it was the thought of the legislature that it was unjust that the rights and protection afforded several workmen of different employers under the workmen's compensation act should be different when these employes were working together on the same premises, on the same project, and subject to the same risks of injury. The subdivision under consideration sought to carry out that policy."

Speaking of our prior cases, we quoted further from Mr. Justice Pirsig where he said (213 Minn. 238, 6 N. W. [2d] 364):

"Misled by the confusing language used in the subdivision, we have not proceeded from this point of view. We have examined not the common activities of the employes but rather the common purposes or enterprise of the employers. These tests have only an indirect relation to the policy sought to be effectuated, and, in consequence, endless and fruitless litigation has come before this court over their application. * * *

"* * * The statutory terms *'common enterprise' and 'same or related purposes' of the employers should be construed to mean that their employes were engaged in some common activity which brings them within the policy underlying the subsection."* (Italics supplied.)

Speaking, then, of the problem before us in the Gleason case, we said (214 Minn. 509, 8 N. W. [2d] 813):

"In the present case it is plainly to be seen that defendant, an independent construction contractor, and the hatchery were not engaged in a 'common enterprise' or in the 'accomplishment of the same or related purposes' at the time and place of plaintiff's injury. True, they were both interested in having the repair job done, but that is true whenever one contracts for any improvement, whether a repair job or new construction. *Common enterprise could be said to have existed while the hatchery workmen were engaged with those regularly employed by defendant,* since they were *working together* and *exposed to the same risks.* In that event, if harm had come to one of them, obviously it would be but fair and just that, since both employers were under the act, *the workmen so employed should stand in the same relation to each other and to their employers as if they were working for a common employer.*

\* \* \* \* \*

"The workmen's compensation act was enacted to simplify and rearrange the obligation of the master to the servant in relation to injuries received in the employment. *There was no intent to change or interfere with the relation between the servant and third persons or to interfere with the servant's right of action*

*against third persons, except as that right might affect compensation from the master.* To step outside of that sphere and deny the servant his right of recovery against third persons would be to unjustly discriminate against him as compared with other persons injured by third persons and to deprive him of a cause of action left to others. *To do so would be beyond the scope of the act as expressed in its title and would not be germane to its purpose.* The act evinces no purpose to deprive an employe of such a cause of action under the ordinary relationship, although providing for subrogation in proper cases. It confines the deprivation of such causes to servants of masters engaged in a common enterprise or in related purposes on the premises where the injury occurs. The *strict tenor* of the words used places the distinction solely on the 'common enterprise' or 'related purposes' of the masters, regardless of whether the injured servant be engaged in such enterprise or purpose; but *we must interpret the language in the light of the purpose and intent of the act,* as this court did in construing the original railroad fellow-servant act, which in its tenor applied to all servants of railroads, whether exposed to the extra hazards peculiar to railroading or not. * * * Here, we think the legislature *intended only to deny common-law rights to servants who engaged in the 'common enterprise' or 'related purposes' of the masters and not to deny such rights to servants of the same master who are not so engaged. Thus there is no unjust discrimination. There is ground for such classification, because, as to common enterprises and similar related purposes, the masters have joined forces and in effect have put the servants into a common pool. To deprive the servant of his common-law action when he is not engaged in the common enterprise or related purpose is to deprive him of a cause of which others whose masters are not so engaged are not deprived in like circumstances, simply because in some other branch of the master's activities on the premises the master has joined forces with the tortfeasor.* We do not regard this as a sound basis for classification." (Italics supplied.)

While the Gleason case did not turn exclusively upon the failure of the title of the act to include the relation of the employe to third persons,[2] the fact that the legislature did not include such relationship in the title lends very definite support to our view, as expressed in the Gleason case, that the legislature intended that an employe's common-law right of action be eliminated only where two or more employers subject to the act are engaged on the same project and their employes are working together in such fashion that they are exposed to the same or similar hazards created by such mutual engagements and are exposed to the same risks of injury. The dissenting opinion of Mr. Justice Peterson in the Gleason case interprets the majority opinion as we do here. The federal courts have so interpreted the Gleason case. E. I. Dupont De Nemours & Co. Inc. v. Frechette (8 Cir.) 161 F. (2d) 318, opinion by Judge Sanborn.

Raymer's employes were not working with Steenberg's or at anything relating to the laying of the concrete floor any more than plaintiff was in the Gleason case. Nor were they working with or on anything relating to the trucking or delivery of concrete to the new construction. There was certainly no mutuality of hazard be-

---

[2]The title of L. 1921, c. 82, reads as follows:

"An act prescribing the liability of an employer to make compensation by way of damages for injuries due to accident or occupational disease received by an employe arising out of and in the course of employment, modifying common law and statutory remedies, in such cases; establishing an alternative elective schedule of compensation, regulating procedure for the determination of liability and compensation thereunder in certain cases, repealing Chapter 467, General Laws of Minnesota for 1913, and acts amendatory thereof; and all acts and parts of acts inconsistent with this act, and defining terms used therein and prescribing penalties and forfeitures for the violation thereof."

The title of L. 1923, c. 279, reads as follows:

"An act to amend Section 31 of Chapter 82, General Laws 1921, commonly known as the Workmen's Compensation Act."

In neither the Gleason case nor in the case at bar was the question directly raised as to the scope of the title being insufficient to cover the relation of the employe to third parties.

tween Raymer's employes, who were removing the door, and Shiely's driver. E. I. Dupont De Nemours & Co. Inc. v. Frechette (8 Cir.) 161 F. (2d) 318 (a case directly in point). Counsel's suggestion in oral argument that Raymer's employes might have dropped a hammer on Shiely's driver ignores the impossibility of so doing, unless the driver stopped his truck, got out of the cab, and passed under the ladders, a procedure entirely outside his line of duty. So, even if the delivery cases hereinafter cited did not apply, Shiely would have no defense under the 1923 amendment.

As to Steenberg, were its employes exposed to the same hazards as Raymer's? There was no evidence offered which tended to prove that they were. Steenberg's employes were engaged at the time in laying a concrete floor in a wholly different part of the building, an activity wholly foreign to and in no way related to Raymer's contract for removing the door. There is some evidence that somewhere Steenberg's men were erecting a dispatcher's office, but Steenberg offered no evidence as to where or how that work was being done. Had Steenberg's foreman not rerouted Shiely's trucks through the old warehouse and attempted to guide Roach as he backed up, Steenberg would not have contributed to plaintiff's injury. No employe of Steenberg's is shown to have been exposed to any hazard from the backing of the trucks through the old warehouse. Steenberg's employes were as remote from the hazards created by the removal of the door upon which plaintiff was working as was the plaintiff in the Gleason case from her fellow employes who were helping lay the floor in that case.

Under the rule established by the Gleason case, we find no mutuality of hazard between Raymer's employes, who were removing the door, and either Shiely's driver, who was delivering concrete, or Steenberg's employes, who were then engaged elsewhere on the premises in wholly different activities. We hold that the 1923 amendment does not avail either defendant.

■ There is an additional reason why Shiely may not avail itself of the 1923 amendment as a defense. Shiely was merely delivering a commodity to Steenberg. Duus v. Duus, 181 Minn. 232, 232 N. W.

114; Anderson v. Interstate Power Co. 195 Minn. 528, 263 N. W. 612; Tevoght v. Polson, 205 Minn. 252, 285 N. W. 893; Gentle v. Northern States Power Co. 213 Minn. 231, 6 N. W. (2d) 361. These cases hold squarely that the mere supplying and delivery of a product by one employer to another does not bring the employers within either clause of the amendment. Shiely is in the same position as if it had been delivering sand or cement separately to Steenberg. It did nothing but unload the mixture at the points designated by Steenberg. It was not engaged in a common enterprise or related purpose with either Steenberg or Raymer.

■ The verdict against these defendants was for $40,000. Plaintiff's injuries were permanent and severe. He suffered much pain. His earning capacity was permanently impaired. We take judicial notice that the purchasing power of money has shrunk to a point where comparison with verdicts previously rendered is futile. The trial court, before whom the doctors testified and plaintiff appeared, refused to reduce the verdict. We have carefully read the record and find no indication that passion or prejudice vitiated the jury's finding; nor does the size of the verdict, measured in present-day dollars, so indicate.

■ Counsel for Steenberg attempts to argue that the trial court erred on one occasion in omitting to couple with its charge as to negligence an instruction that the negligence must be the proximate cause of the injury to justify a verdict for plaintiff. The court in its charge made it clear to the jury that proximate cause was a necessary element for recovery; and again, when the jury asked for further instructions, it included proximate cause as a necessary element for recovery. Moreover, Steenberg's assignment of error is wholly insufficient to present the question.

Orders affirmed.

Mr. Justice Thomas Gallagher took no part in the consideration or decision of this case.

Mr. Justice Christianson took no part in the consideration or decision of this case.