# WILLIAM M. CRAWFORD v. WOODRICH CONSTRUCTION COMPANY, INC., AND OTHERS.[1]

March 20, 1953.

No. 35,862.

---

[1]Reported in 57 N. W. (2d) 648.

*William H. Freeman,* for appellant.

*Warner & Ratelle,* for respondent William M. Crawford.

*Ernest A. Rich,* for respondent Elmer Zaske.

*Ray G. Moonan* and *John M. Fitzgerald,* for respondent Walter Baker.

*J. A. A. Burnquist,* Attorney General, *Louis B. Brechet,* Special Assistant Attorney General, *Thomas K. Scallen,* Special Assistant Attorney General, for the State, *amicus curiae.*

MATSON, JUSTICE.

Defendant Woodrich Construction Company appeals in a personal injury action from an order denying its alternative motion for judgment notwithstanding the verdict or a new trial.

Plaintiff, who has already received benefits from his employer under the workmen's compensation act, brought this action in tort against three third parties; namely, Woodrich Construction Company, hereinafter called the company; Walter Baker, an operator of a fleet of gravel trucks; and Elmer Zaske, a truck driver, who owned and operated his own truck under an agreement of hire with Walter Baker. The jury gave plaintiff a verdict for $80,000 but only against the Woodrich Construction Company which is the appellant herein.

The company contracted with the state of Minnesota to lay a concrete roadway on state highway No. 44 between Caledonia and Spring Grove, Minnesota. Pursuant to this undertaking, the company entered into an agreement with defendant Walter Baker, whereby the latter agreed to furnish dump trucks to haul dry mix to the job from the company's batch plant near Spring Grove. The company paid Baker according to the number of batches of dry mix hauled. Baker hired the truckers, among them defendant Elmer Zaske who hauled the mix in his own truck. Baker paid Zaske by the hour and also paid him for the use of his truck. Plaintiff, William M. Crawford, 23 years old, was employed by the Minnesota highway department as an engineer's aid or inspector on the highway project. He was seriously injured while he was checking the alignment of the concrete forms when Zaske backed his truck over him.

We are concerned with the following issues:

(1) Were the state of Minnesota, as plaintiff's employer, and the defendant company engaged in the due course of business (a) in the furtherance of a common enterprise, or (b) in the accomplishment of the same or related purposes within the meaning of M. S. A. 176.06, subd. 1, so as to bar plaintiff, who had received

benefits from his employer, from proceeding in tort against the company?

(2) Does the evidence sustain a finding that the company was negligent and that such negligence was the proximate cause of plaintiff's injury?

(3) Was plaintiff guilty of contributory negligence as a matter of law in inspecting the alignment of construction forms from a position where men backing trucks might not be able to observe him?

(4) Was the issue of whether Baker was an independent contractor or an employee of the company properly submitted to the jury under the trial court's instructions?

(5) Was the verdict perverse?

The accident occurred about 2 p. m. on June 8, 1950, about one-half mile southwest of Caledonia where the road runs generally in a north and south direction. The work of laying the concrete had started near Caledonia seven days earlier. As fast as the concrete was poured the paving machinery and equipment was moved southward. The cement mix or batch, however, was brought in from the south by dump trucks which traveled from the batch plant near Spring Grove to the cement mixer or paving machine hereinafter called the paver.

A proper understanding of the facts requires a consideration of the methods and machinery employed in preparing the roadbed. First, bladers removed the old highway surface down to the subgrade, which was in turn leveled by rough graders. After the blading and rough grading, steel forms nine inches high were set 22 feet apart, one on each side of the highway. These steel forms served a dual purpose. First, they served as lateral forms between which the concrete road slab was poured. Secondly, they served as rails upon which some of the paving equipment rode. The company employees set out the forms, aligned them horizontally and laterally, oiled the inside of the form so that the concrete did not stick, and then tamped the subgrade on which the forms rested

where it was not solid. After the forms were set, a machine called a fine grader, which rode on the forms, leveled off the subgrade to the required depth and cast the dirt scrapings into windrows which were deposited outside the forms. At the time of the accident, as the jury could reasonably find, these windrows were about one and one-half feet high and their base touched, or came near to, the outside of the forms. After the fine grader had completed its work, a five-ton roller, six feet wide, was used to pack down the subgrade.

At the time of the accident, the various pieces of road-making machinery and equipment were located on a straight piece of road-bed and in the following order. Farthest to the north and midway between the forms, was the cement mixer or paver which consists primarily of a hopper or "skip" into which the mix was dumped by the trucks, a mixer, and a boom which distributed the mixed concrete between the forms. About 280 feet to the south, on the left or west side of the space between the forms, was the turntable, an H-shaped ramp which was hinged and set on a pivot. The turntable was used to turn the loaded trucks around so that they could back up to the paver and dump their loads into the skip. As the trucks approached the turntable from the south, a company employee in charge of the turntable would push down the end of the turntable so that the truck could drive forward upon it to a point at which the truck balanced on the turntable. The turntable operator would then manually push the turntable around until the truck faced in approximately the opposite direction and then he would signal the driver to back down. The jury could reasonably find that, *contrary to the situation on the day of the accident,* it was customary on a straight roadbed to place the turntable on the right-hand side of the road near the east form. This practice was followed so that the truck driver, who could not see behind him in the area of the right rear wheels, could lean from the left side of the truck cab and watch the east form as a guide when he backed his loaded truck toward the paver.

On the day of the accident, the six-foot-wide roller was parked about midway between the turntable and the paver at a distance

of three or four feet from the east form. *This position left a lane of only about 12 feet wide between the roller and the west form.* The area between the turntable and the paver has been appropriately described as the business or congested area because here the immediate paving operations were concentrated and a dump truck, either loaded or unloaded, passed in or out about once every minute. Just north of the roller, when the accident occurred, stood a truck which had unloaded and was waiting to permit the Zaske truck to back off the turntable to the paver with its five-ton load of mix.

The *loaded* trucks had been backing up between the forms in the congested area at the rate of about one every two minutes. The evidence sustains a finding that, because the turntable was located near the west form and not on the east side, the truck drivers in backing were unable to use the east form as a guide and instead relied upon rather well-defined tire tracks imprinted upon the roadbed by the prior passage of backing trucks. The tire track made and used by the right wheels of the trucks was about two feet wide and its outside edge was approximately two and one-half feet east from the west form. It is not to be overlooked that there were many other truck tire tracks in the congested area.

Now we come to plaintiff's activities in the congested area as an engineer's aid employed by the state highway department. His duties were to inspect (1) the inside of the forms to see that they were clear of old concrete and properly oiled, (2) the firmness of the subgrade upon which the steel forms rested, (3) the alignment of these forms, and (4) the height of the forms to see that their top surface conformed in height with certain grade stakes located three feet outside the forms. The jury could reasonably find that an engineer's aid in inspecting the forms for height and alignment customarily crouched or knelt down on the inner side of the form, put his head on top of the form, and sighted along the top of the form toward the paver from some point between the paver and the turntable. The jury could also reasonably conclude that the sighting or inspecting was not done from a position outside the forms

because the windrows of dirt made it difficult, if not impractical, to do so. Alignment inspections took from less than one minute up to five minutes depending upon the number and magnitude of the defects in the form. If anything was found wrong with the placement of the form, the engineer's aid would notify a company employee who would immediately correct the flaw. The engineer's aid only pointed out defects *and in no way helped or directed the company employees in the making of corrective adjustments.*

Plaintiff, when the accident occurred, was checking the alignment of the west form from a situs about 140 feet north of the turntable, or approximately opposite the location of the parked roller. He had knelt down, rested his head and both hands on the form, and was sighting north toward the paver. In this position his body and legs extended partially into the tire tracks followed by the right wheels of the backing trucks. At about the same time defendant Zaske had driven his loaded dump truck—of a gross weight of about 17,000 pounds—upon the turntable. The turntable operator, a company employee, turned him around and then gave him the signal to back up. In giving the back-up signal, the turntable operator had a clear and unimpeded view in the congested area along the west form toward the paver. Zaske backed up toward the paver at three to four miles an hour and in so doing opened his left cab door to sight along the tire tracks previously mentioned. While thus operating his truck in reverse, Zaske could not see along the west form where plaintiff was working because the truck body blocked his vision. As he backed up the right rear wheels of his truck passed over the legs and body of the plaintiff who was then in a kneeling position as hereinbefore described. The record is silent as to how long plaintiff had been in this position before he was run over by the truck, but the evidence shows that the form in that area had numerous minor defects.

■ First we have the question whether plaintiff's action against the Woodrich Construction Company is barred by § 176.06, subd. 1, of the workmen's compensation act. The state of Minnesota, plaintiff's employer, was self-insured, and the company was insured under

the workmen's compensation act. Plaintiff has received compensation benefits from his employer, the state. Section 176.06, subd. 1, deprives an employee of his common-law tort action against third parties when the injured employee has received compensation benefits for the injury from his employer and when the third party liable for damages and the employer liable for compensation were both either insured or self-insured and, in addition, were both engaged in the due course of business (a) *in the furtherance of a common enterprise* or (b) *the accomplishment of the same or related purposes* in operation on the premises where the injury was received and at the time thereof. Was plaintiff, who was present on the construction site and performing his duties as a state inspector when injured, deprived of his common-law action because the state and the company were engaged (a) in the furtherance of a common enterprise or (b) the accomplishment of the same or related purposes? The question is simplified by our decision in Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808, wherein, as a matter of statutory construction, we construed the terms "common enterprise" and the "accomplishment of the same or related purposes" of the employers (§ 176.06, subd. 1) to mean that the employers were at the time and place of injury engaged on the same project and their employees were exposed to the same or similar hazards created by such mutual engagement. In the recent decision of Swanson v. J. L. Shiely Co. 234 Minn. 548, 558, 48 N. W. (2d) 848, 854, we reaffirmed the Gleason case and specifically stated that pursuant to § 176.06, subd. 1, "the legislature intended that an employe's common-law right of action be eliminated only where two or more employers subject to the act are engaged on the same project and their employes are working together in such fashion that they are exposed to the same or similar hazards created by such mutual engagements and are exposed to the same risks of injury."

A consideration of the rule as applied to the *employees* and the *hazards,* with reference to *such mutual engagement,* leads to the inevitable conclusion that the employees must be engaged in the

performance of the *same project* of the employers. In applying the rule we have recognized that the "same project" need not necessarily *create* the "same or similar hazards" to which the employees are exposed and that it is only necessary that the "same project" exposes them to such hazards. In other words, it is the *exposure* rather than the *creation* of the hazards which makes the rule applicable.[2] A careful reading of the Gleason and the Swanson decisions, *supra,* can only lead to the further conclusion that the statutory phrases "common enterprise" and the "accomplishment of the same or related purposes" no longer have an independent significance and that, in recognition of the legislative intent, *they have been wholly superseded by, and have been merged in, a new rule born of statutory construction.* Henceforth, therefore, the last paragraph of § 176.06, subd. 1, should be *interpreted and actually applied* as if it in fact read as follows:

"The provisions of subdivision 1 of this section shall apply only where the employer liable for compensation and the other party or parties legally liable for damages were both either insured or self-insured and were engaged in the due course of business," *on the same project, and their employees were working together in the performance of such project in a manner which exposed them to the same or similar hazards* on the premises where the injury was received and at the time thereof, and not otherwise. (The italicized portion represents the change in wording to carry out the legislative intent as construed in the Gleason and Swanson decisions.)[3]

[2]Volding v. Harnish, 236 Minn. 71, 51 N. W. (2d) 658; see, Breimhorst v. Beckman, 227 Minn. 409, 421, 35 N. W. (2d) 719, 728, for a discussion and application of the term "exposure" as applied to hazards.

[3]No purpose will here be served by a discussion of the legislative history and purpose of § 176.06, subd. 1. The subject has been fully covered in Swanson v. J. L. Shiely Co. 234 Minn. 548, 48 N. W. (2d) 848, and Gleason v. Geary, 214 Minn. 499, 8 N. W. (2d) 808. It is enough to note that the court in arriving at the legislative intent is aided by two rules of statutory construction working in conjunction: (1) A person is not to be deprived of his common-law rights unless the intention to do so is made

There is no longer any occasion to discuss or apply the ambiguous and litigation-producing phrase "the accomplishment of the same or related purposes," and any decisions which do are expressly overruled.

■ In applying § 176.06, subd. 1, to the facts of this case, or any other case, to determine whether the plaintiff-employee is deprived of his common-law tort action against a third party, the question becomes simply one of whether the employer and the third party (both of whom were either insured or self-insured) were engaged in the due course of business on the *same project* and whether their employees were working together in the performance of *such project* in a manner which exposed them to the same or similar hazards at the place and time of injury. Here the state, plaintiff's employer, and the company clearly were not engaged in the same project. The state was not engaged in the project of building or repairing a road; its only connection with the project was that it had contracted for the road-building services of the company. It cannot be said that the state—or any other employer—which merely carries on a systematic inspection to insure that it is getting the quality of services for which it has obligated itself to pay under a construction contract is engaged in the same project as the contractor who performs the work. Furthermore, the plaintiff as an inspector herein was not engaged in the performance of the project.[4] When he found a defect, he performed no services to correct such defect. Correction work was left entirely to employees of the company. Obviously plaintiff is not barred from prosecuting a common-law action against the company.

■ The evidence sustains a finding that the company was negligent and that such negligence was the proximate cause of the accident. The company exercised *control over the location and use*

obvious. State Bank v. Sylte, 162 Minn. 72, 75, 202 N. W. 70, 71. (2) The workmen's compensation act is to be liberally construed to effect its purpose. Aleckson v. Kennedy Motor Sales Co. 238 Minn. 110, 55 N. W. (2d) 696.

[4] We, therefore, need not determine here whether plaintiff was exposed to the same or similar hazards.

of the turntable, the roller, and the paver, which were all located within the congested area at the time of the accident. Furthermore, there is evidence which supports a finding that, although Baker generally controlled the operation of the trucks, the company assumed control of the trucks in the congested area. The supporting evidence indicates that: (1) Baker never instructed the truck drivers what route to follow between the turntable and the paver nor what to do when once in that area; (2) the turntable operator, a company employee, not only determined when the truck drivers would drive onto and back off the turntable but also materially designated the route to be followed by the trucks to the paver by stopping the turntable at a point of his own selection before signaling them to back down; (3) the company employee in charge of the paver controlled the time when the trucks would dump the batches of mix and when they would leave the paver; (4) the truck drivers, subject to the control and request of company employees, would perform additional tasks, such as (a) moving the turntable to locations determined by company employees, (b) standing on a scraper blade attached to the paver to add necessary weight to smooth defects in the subgrade, and (c) delivering messages to the company employees at the batch plant; and (5) lastly, the congested area was under the company superintendent's exclusive control as confirmed by his own admission.

In using the instrumentalities under its control the company owed to plaintiff, a state inspector known to be present on the construction site, the duty of exercising reasonable care for his safety. See, Cudahy Packing Co. v. McBride (8 Cir.) 92 F. (2d) 737, 739, certiorari denied, 303 U. S. 639, 58 S. Ct. 526, 82 L. ed. 1099; 22 Minn. L. Rev. 898; cf. Shypulski v. Waldorf Paper Products Co. 232 Minn. 394, 45 N. W. (2d) 549; 35 Minn. L. Rev. 512. Since it could be found that the company reasonably should have anticipated that plaintiff, in making alignment inspections, would normally take a position inside the forms from which he could not see the trucks backing up, the evidence supports a finding of negligence on either or both of two grounds; namely, (1) negligence in the lo-

cation of the turntable and the roller, and (2) negligence in failing to provide adequate supervision for the trucks while they backed up in the congested area. The location of the turntable on the left or west side of the subgrade was contrary to the usual practice and the result was that when the trucks backed up along the west line, the truck drivers could not see the west form line either to use as a guide or to observe whether anyone was working on it. The truck drivers could not angle over to the east form since the roller was in the east lane midway between the paver and the turntable. The evidence sustains a finding that there was no justifiable reason for locating the turntable on the west side or for parking the roller midway between the turntable and the paver. The jury could find that the company, charged with knowledge of these conditions, was not in the exercise of due care when it failed to provide adequate supervision for the trucks as they backed through the congested area under conditions which prevented the truck drivers from observing the men who were working along the west form line. Clearly the failure of the turntable operator, who had a clear view along the west form line to the paver, to warn either the plaintiff or Zaske, the truck driver, of the other's presence could be found to constitute negligence imputable to the company. Reasonably the turntable operator should not have given the back-up signal until it was safe for the truck to proceed. We must conclude that there is ample basis for a finding of negligence on the part of the company.[5]

4. The company, however, urges that any negligence on its part, as a matter of law, is not the proximate cause of plaintiff's injury because the chain of causation set in operation by defendant's negligence was broken by independent and efficient intervening forces. The intervening forces which it asserts isolated its negligence from any liability are the subsequent acts of Zaske, in backing up his truck, and of plaintiff, in sighting from inside the west form line. The company, however, should have foreseen the intervention of these forces when it located the turntable and the roller and also when it

[5]Cf. Wamser v. Bostian, 230 Iowa 792, 298 N. W. 860; Rebmann v. Heesch, 227 Iowa 566, 288 N. W. 695.

failed to provide adequate supervision of the trucks in the congested area. The rule is well established that if the occurrence of an intervening cause ought reasonably to have been anticipated, such intervening cause will not interrupt the causation between the original cause and the injury,[6] since reasonably foreseeable intervening forces are within the scope of defendant's original fault. 21 Minn. L. Rev. 19, 38 to 47.

■ Although reasonable minds might differ as to whether plaintiff's actions were negligent, we cannot say that he was guilty of contributory negligence as a matter of law. There were so many different tire tracks within the congested area that the jury could conclude that the tracks made by the backing trucks did not put him upon notice as to the danger of his position. Furthermore, the dirt windrows were of such size and so close to the outside of the forms that it could reasonably be inferred that it would have been impractical for plaintiff to conduct his inspection other than from a crouching position inside the forms. It is likewise not to be overlooked that plaintiff's inspection work in sighting along the forms to check for alignment was exacting and demanded his full attention and concentration. A moment of mental preoccupation on the part of a person charged with the duty of making an exacting inspection of a nature which demands concentration cannot be said to constitute negligence as a matter of law. Conway v. Naylor, 222 N. Y. 437, 119 N. E. 71. Taking into consideration the dense traffic in the congested area wherein each actor had to depend to some extent upon the carefulness of others for his safety, and with due regard to the exacting nature of plaintiff's inspection work which required concentrated attention, the issue of plaintiff's negligence was for the jury.

■ Was the issue of whether Baker was an independent contractor or merely an employee of the company properly submitted to the jury under the court's charge? It is asserted that the charge in effect held Baker as a matter of law to be an employee and precluded

[6]Eichten v. Central Minnesota C. P. Assn. 224 Minn. 180, 28 N. W. (2d) 862; Ferraro v. Taylor, 197 Minn. 5, 265 N. W. 829.

a finding that he was an independent contractor. The foregoing assertion as to error in the charge is followed by the contention that the verdict is perverse on the theory that the only act which could be found to constitute negligence was a failure to supervise the trucks while they were being backed up to the paver and that such duty of supervision, if any, was conclusively shown to be Baker's because of his admission that the trucks were under his supervision. Therefore the company contends that its liability under the charge, in the light of Baker's admission, could be predicated only upon the doctrine of *respondeat superior*. The company then concludes that, since it was found liable for negligence and Baker was not, the verdict is perverse in that, under *respondeat superior* liability, if the employee is not negligent the employer is not liable.[7]

We find no error in the court's instructions which provide a foundation to support the theory of perversity. The instructions were that Baker could be found liable under two theories: (1) For the negligence of Zaske, the truck driver, under the doctrine of *respondeat superior*, and (2) for his own negligence if the jury found him (Baker) to be in charge of the premises. In the light of the context the word "premises" could have been understood only to refer to the congested area. The instructions did not say or imply that the company *must* also be found liable if Baker was found negligent in any supervision attributable to him. In fact the instructions are to the contrary since the jury was told in effect that the company would be liable for Zaske's negligence—together with Baker—only if the company was found to have assumed dominion and control over Zaske's operation of the truck in the congested area. Nowhere in the instructions were the jurors told that Baker's negligence, if any, was imputable to the company. The instructions *when taken as a whole* correctly submitted to the jury the question as to Baker's status and did not as a matter of law designate him as an employee. Despite Baker's admission of general control of the trucks, the jury could find his control, by virtue of the company's

[7]Cf. Stanger v. Thompson, 153 Minn. 488, 190 N. W. 897.

assumption of dominion, was nonexistent within the congested area. The evidence is ample to sustain a finding that the company *alone* was negligent in the manner in which it placed its equipment and in the manner in which it controlled and directed the paving operations within the congested area. There is no basis for the contention that the verdict is perverse.

Error is also predicated on the trial court's ruling denying the admission into evidence of a written contract between the company and Baker. The contract provided that Baker *would personally supervise the operation of the trucks on the job site*. Assuming that the ruling was erroneous, we cannot say that it was prejudicial since Baker admitted he was in control of the trucks. It is not reasonable to assume that the contract, if it had been admitted, would have added anything but cumulative effect to Baker's express admission. The relationship between the company and Baker, as to their operations within and without the congested area, was fully and thoroughly presented to the jury, and no prejudice could have resulted from the exclusion of the contract.

There is no occasion whatever to pass on the question of whether the jury should have been permitted to determine whether the plaintiff and the company's employees were exposed to the same or similar hazards. In the first place, the appellant's brief admits that all parties accepted it as a court issue and made no request for jury instructions thereon. The theory upon which a case is tried below becomes the law of the case and must be adhered to on appeal. Edelstein v. D. M. & I. R. Ry. Co. 225 Minn. 508, 31 N. W. (2d) 465; 1 Dunnell, Dig. (3 ed.) § 404.

It is also alleged that the court in the first trial erred in granting a new trial upon its own motion. Obviously, that issue does not arise in an appeal from the second trial.

The order of the trial court is affirmed.

Affirmed.