*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A13-2185**

Douglas Speltz, et al.,
Respondents,

vs.

Interplastic Corporation, defendant and third party plaintiff,
Appellant,

vs.

Egan Company,
Respondent

**Filed September 8, 2014**
**Affirmed**
**Peterson, Judge**
**Dissenting, Johnson, Judge**

Hennepin County District Court
File No. 27-CV-12-22268

Eric J. Magnuson, David E. Bland, Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, Minnesota (for respondents Douglas and Jennifer Speltz)

Timothy J. Leer, Brian Michael McSherry, O'Meara, Leer, Wagner & Kohl, P.A., Minneapolis, Minnesota (for appellant)

Paula Duggan Vraa, Larson King LLP, St. Paul, Minnesota (for respondent Egan Company)

Considered and decided by Peterson, Presiding Judge; Schellhas, Judge, and Johnson, Judge .

UNPUBLISHED OPINION

**PETERSON**, Judge

Appellant challenges the district court's denial of its summary-judgment motion seeking dismissal of respondent-employee's personal-injury claims on the basis that the claims are barred by the exclusivity provision of the workers' compensation act. Appellant argues that the district court erred by determining that fact issues exist regarding whether it was engaged in a joint enterprise with respondent-employer. We affirm.

## FACTS

Appellant Interplastic Corporation operates a plant in Minneapolis where it manufactures resins that are sold to third parties for use in fiberglass items, such as hot tubs and shower surrounds. Respondent Egan Company is a contractor that employed respondent Douglas Speltz as a welder. In December 2009, Interplastic and Egan entered into a contract for Egan to perform work on Interplastic's piping system, including the piping system for the chemical phthalic anhydride (PA).

After Egan completed the initial work on the PA system, it still was not performing as expected. Travis Rudoll, a chemical engineer employed by Interplastic, determined that the system's return line needed to be rerouted to the top of the PA tank for the system to function properly. Egan agreed to do the rerouting, and Rudoll testified in a deposition that an Egan employee determined that the rerouting could be accomplished by cutting a hole in the manway cover on top of the PA tank and running the return line through the manway cover with a stinger pipe.

2

Egan assigned welders Speltz and Michael Posusta to the project. Speltz, a stainless-steel-welding specialist, worked under Posusta's direct supervision. Interplastic Maintenance Supervisor Pat Gaulke assigned Interplastic employee Roshon Lewis to provide support to Speltz and Posusta on the PA rerouting project.

As required by law, Interplastic has a corporate safety procedure governing hot work that requires all employees and contractors to obtain a hot-work permit before beginning hot work in the facility. Hot work is "any activity which can cause sufficient heat to ignite nearby combustible or flammable materials," including welding. Because the PA rerouting project required cutting and welding, hot-work permits were required.

When a hot-work permit is requested, an Interplastic employee inspects the area where the hot work is to be performed to ensure that the site is safe and that all appropriate precautions are taken. Both the employee who inspects the area and a work-area or shift supervisor are required to sign the hot-work permit. The hot-work procedure also requires a fire watcher to be present whenever there could be flames or sparks. The fire watcher is required to sign the hot-work permit before the work is performed and one hour after the work is completed, certifying that the fire watcher has inspected the area and that it is safe. The person performing the hot work is also required to sign the hot-work permit.

Egan's safety director Larry Hanson testified that Egan's workers depended on Interplastic employees to provide training on hot work because Interplastic employees are most familiar with the plant and its hazards. Egan stated in answers to interrogatories that Lewis was the fire watcher for Interplastic on the PA rerouting project. Speltz

3

testified that Lewis was the main Interplastic employee who worked with him and Posusta on the rerouting project.

Work on the rerouting project began on June 7, 2010. Interplastic maintenance worker Dave Johnson went over the June 7 hot-work permit with Speltz and Posusta, confirmed that the work area was safe for hot work and signed the permit as the hot-work supervisor. Jack Doughty signed the permit as the work-area supervisor. Interplastic's safety manager reviewed the permit with Speltz and Posusta. Speltz signed the permit as the person performing work and Posusta signed the permit as the observer or fire watcher.

Lewis estimated that he was with Speltz and Posusta for six hours during the June 7 workday. He testified that his supervisor had not assigned him to watch them but was aware that he was there. Lewis described his role as helping Speltz and Posusta "with what they needed to check the piping for the clog or what is going on or whatever they needed as far as needing to know about something." Posusta performed the final fire check of the work area after work was completed on June 7 and signed the hot-work permit. Posusta testified that he and Speltz met with Lewis at the end of each day to report on the day's events, which Lewis then reported to Rudoll.

On June 8, 2010, Speltz and Posusta obtained another hot-work permit. Lewis filled out the permit, went over it with Speltz and Posusta, and signed the permit as the hot-work supervisor. Lewis again spent about six hours with Speltz and Posusta.

Because hot work was being performed inside the facility, lower explosive limit (LEL) readings were required before welding could begin and while welding was being

4

performed. Although Egan owned LEL meters, it did not provide one to Speltz and Posusta because it was unaware that one would be required for the rerouting project and, in any event, Egan believed that Interplastic would provide one if needed. Interplastic also provided Speltz with protective equipment when needed.

On June 9, 2010, Speltz and Posusta obtained two hot-work permits from Interplastic, both of which were signed by Johnson as work-area supervisor. Lewis estimated that he spent six or seven hours of the workday with Speltz and Posusta. Speltz testified that, in the morning, he, Lewis, and Posusta worked to unclog the return line of the PA system. Speltz testified that the three of them "were all working on [removing the clog]" by "heating it up," "putting different stuff in [the pipe]," using "a cold chisel," hammering on it, and drilling a hole through it. Lewis also testified that he helped Speltz and Posusta with that work.

Later that day, Rudoll and Egan employee Andy Gross were present when Speltz was welding a flange onto the PA pipe. Rudoll had instructed them to inert the piping with nitrogen before welding but approved Speltz and Posusta's request to use argon instead.

Near the end of the June 9 workday, Lewis helped Posusta remove the manway cover from the top of the PA tank. Posusta testified that Lewis removed the cover and brought it to the maintenance shop to drill a hole in it. Lewis testified that he removed the bolts from the cover but that Posusta removed the cover. In the maintenance shop, Lewis helped Posusta set up Interplastic's drill press, so Posusta could drill the hole in the cover. Lewis also sprayed the cover with cutting oil as Posusta drilled the hole. Posusta

5

then put the cover back on the tank and put a piece of wood on the cover. Posusta signed off on the June 9 hot-work permits, confirming that he had performed a final fire check of the work area one hour after work was completed.

On June 10, 2010, Speltz and Posusta arrived at the plant at about 6:00 a.m. They got their materials ready on top of the PA tank to tack weld the return line to the tank cover. Posusta testified that they "assembled spool pieces, brought welding leads out there and were ready and then went down and got the hot permit." They obtained the permit from maintenance worker Dale Hippe, who filled it out and then obtained signatures from Gaulke and shift supervisor Ron Dempski. Posusta signed the permit as fire watcher, but the signature line for the person doing the work was left blank.

Speltz and Posusta went outside to the tank and waited for Lewis to get there before they began welding. When Lewis arrived, he joined Speltz and Posusta on top of the tank. Posusta leveled the pipe and asked, "We're ready, [Lewis]?" Lewis responded, "Yep." Speltz made the first tack weld. As Posusta leveled the pipe for the second weld, Lewis stated that they should purge the tank by filling it with nitrogen to create a nitrogen blanket between the cover and the PA in the tank. Speltz began the second tack weld, and the tank exploded. When Lewis was asked about his role that day, he testified that he "just came up to see what was happening," he was "hanging out," he had no official role, and he came up "to BS with the guys."

Speltz, Posusta, and Lewis were injured in the explosion and received workers' compensation benefits. Speltz and his wife, respondent Jennifer Speltz, brought this personal-injury action against Interplastic. Interplastic moved for summary judgment

6

seeking dismissal of the action on the ground that the district court lacked subject-matter jurisdiction based on the common-enterprise doctrine. The district court determined that fact issues exist regarding each of the elements of the test for a common enterprise and denied summary judgment. This interlocutory appeal followed.

**D E C I S I O N**

An order denying summary judgment in a negligence action is immediately appealable when dismissal is sought based on the district court's lack of subject-matter jurisdiction. *McGowan v. Our Savior's Lutheran Church*, 527 N.W.2d 830, 831-32 (Minn. 1995). Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. Appellate courts "review a district court's summary judgment decision de novo. In doing so, we determine whether the district court properly applied the law and whether there are genuine issues of material fact that preclude summary judgment." *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC,* 790 N.W.2d 167, 170 (Minn. 2010) (quotation omitted). When reviewing a denial of summary judgment, we view the evidence in the light most favorable to the nonmoving party. *Mumm v. Mornson*, 708 N.W.2d 475, 481 (Minn. 2006).

Under the workers' compensation act, an injured employee may seek workers' compensation benefits from the employer or sue a third party for damages, but not both, if the employer and the third party were engaged "in the due course of business in . . . furtherance of a common enterprise." Minn. Stat. § 176.061, subds. 1, 4 (2012); *LeDoux v. M.A. Mortenson Co.*, 835 N.W.2d 20, 22 (Minn. App. 2013). To be engaged in a

7

common enterprise, (1) the employer and the third party must be engaged on the same project, (2) their employees must be working together on a common activity, and (3) the employees must be exposed to the same or similar hazards. *Id.* Whether a common enterprise existed is a question of law, which we review de novo. *Id.*

*Same project*

This element "encompasses the relationship between employers." *Carstens v. Mayers, Inc.*, 574 N.W.2d 733, 736 (Minn. App. 1998) (quotation omitted), *review denied* (Minn. Mar. 26, 1998). In determining whether the first element is met, it is appropriate to consider whether the employers shared functions and whether there was a long-standing relationship between them. *O'Malley v. Ulland Bros.,* 549 N.W.2d 889, 895 (Minn. 1996) (concluding that two employers engaged on same project when they "shared equipment, assisted in hauling for each other, coordinated the work flow by sending messages through each other, prepared road surfaces for each other by blading or watering, and assisted each other in extricating vehicles stuck in the fill material"); *see also Higgins v. Nw. Bell Tel. Co.*, 400 N.W.2d 192, 194 (Minn. App. 1987) (concluding two employers engaged on same project when they had longstanding, continuous, and close commercial relationship installing, maintaining, and modifying one of the two employer's telephone switching equipment), *review denied* (Minn. Mar. 25, 1987). It is not required that two employers perform identical work to be engaged on the same project. *Ritter v. M.A. Mortenson Co.*, 352 N.W.2d 110, 113 (Minn. App. 1984) (holding subcontractor and contractor were engaged on same project when contractor's employees hooked beams to crane and operated crane and subcontractor's employees signaled

8

commands to crane operator and connected beams to structure). But "[n]ot every contact between an employer and a third party in the course of conducting their separate businesses constitutes engagement by them on the same project." *O'Malley*, 549 N.W.2d at 895 (quotation omitted); s*ee also Crawford v. Woodrich Constr. Co.*, 239 Minn. 12, 22, 57 N.W.2d 648, 654 (1953) (holding two employers not engaged on same project when one performed construction work and other inspected work).

In determining that a fact issue existed on whether Interplastic and Egan were engaged on the same project, the district court relied on the two employers being engaged in different types of business, plastic manufacturing and contracting, and on the distinct division of labor on the PA pipe rerouting project. The court explained that "Egan employees welded, cut pipe and the like; while Interplastic's employees issued permits for certain work to be done, but did not meaningfully participate in completing such work."

Interplastic and Egan had a longstanding relationship going back at least thirteen and a half years before the accident, and Egan performed 58 projects for Interplastic during 2009 and 2010. On the PA pipe-rerouting project, both Interplastic and Egan employees contributed to the project's design, Interplastic provided safety equipment, and Interplastic employees oversaw the project. These facts are all relevant to the same-project determination but do not show the kind of relationship that existed in cases holding that two employers were engaged in the same project. Unlike those cases, Interplastic was Egan's client, and Lewis was assigned to provide support to Egan's

9

employees while they were at Interplastic's plant. The district court, therefore, properly considered the labor performed by individual employees to accomplish the rerouting.

Lewis was assigned to provide support to Speltz and Posusta, but the record is not clear as to the exact nature of Lewis's work assignment on the rerouting project. For example, although Lewis spent about six hours with Speltz and Posusta on June 7, he testified that his supervisor had not assigned him to do so. Also, on June 9, Lewis, Speltz, and Posusta all worked to unclog the return line of the PA system, and Lewis helped Posusta work on a manway cover, but the record does not show whether Lewis did so on his own initiative or as part of his work assignment. Lewis testified that, when he was observing the welding on June 10, he "just came up to see what was happening," he was "hanging out," he had no official role, and he came up "to BS with the guys." Gaulke testified that Lewis's role was to provide support to Speltz and Posusta by "getting them – if they needed permits, if they needed . . . the forklift to move something, just kind of a little bit of gopher work."

Although Interplastic and Egan shared the goal of completing the pipe-rerouting project, viewing the evidence in the light most favorable to the nonmoving party, we cannot determine as a matter of law whether Interplastic and Egan were working in tandem on the same project or whether their relationship was that of a client and a contractor hired to perform an identified task with incidental assistance from the client's employees. The district court did not err in concluding that a fact issue existed regarding whether Interplastic and Egan were engaged on the same project.

10

*Common activity*

"Whether employees were engaged in a common activity is a question that focuses on the functions performed by the employees, not on the goals of their employers." *LeDoux*, 835 N.W.2d at 22. "To be common, the employees' activities must not merely overlap minimally, they must be interdependent." *Id.* at 23 (quotation omitted). When determining whether employees were engaged in a common activity, we look to the task being performed when the accident occurred. *See Gleason v. Geary*, 214 Minn. 499, 501, 509, 8 N.W.2d 808, 809, 813 (1943) (stating that, even though a common enterprise could have existed when hatchery employees labored with contractor's employees to break up and remove a floor, it did not exist at time of accident, in which hatchery employee was injured when temporary catwalk constructed by contractor's employees collapsed).

The only task being performed when the explosion occurred was welding on top of the tank. The issue is whether Lewis was engaged in that activity with either Speltz or Posusta or both. Lewis testified that he "just came up to see what was happening," he was "hanging out," he had no official role, and he came up "to BS with the guys." Lewis testified that he was not the person in charge under the hot-work permit, he did not know who was in charge under the permit, and he did not know who was designated as the fire-watch person. Although Speltz testified that he and Posusta waited for Lewis to arrive because he was the fire watcher, Posusta signed the hot-work permit for June 10 on the line where the fire watcher was supposed to sign, which suggests that he was the fire

11

watcher. Because there is conflicting evidence, we cannot conclude as a matter of law that Lewis was the fire watcher.

Interplastic argues that Lewis was engaged in the welding because he was directing the process. Posusta, who was holding the pipe while it was being welded, testified that, when Lewis arrived,

> [w]e get ready. I level it up. We're ready [Lewis]? Yep. We make the first tack. I level it up. I look at him again. He's got this look of I – I think we should purge. I should fill this tank with nitrogen. And I said, What. And when I said "What," [Speltz] lit up the torch and all hell broke loose. He was there on the tank with us.

This testimony suggests that Posusta looked to Lewis for the okay for Speltz to make each tack weld, but there is contradictory evidence. At another point, Posusta testified that, when he looked up toward Lewis before Speltz began the second tack weld, he was looking away from the weld, which is his normal practice when a weld is about to be made. This testimony is consistent with Egan's answer to an interrogatory, in which Egan stated that Posusta, "who was looking away from the weld in the direction of Roshon Lewis, heard Mr. Lewis say words to the effect: 'purge – I should have purged the tank.'" Also, Lewis testified that, when he got to the tank, Speltz and Posusta were just about to start welding, Lewis said "hey," they said "hey," and Speltz struck the first arc. Finally, Speltz's conduct in beginning the second weld without waiting for an okay from Lewis is contrary to Interplastic's argument that Lewis was directing the welding.

Undisputed evidence shows that Lewis said that the tank should be purged with nitrogen before Speltz began the second weld. Posusta testified that, as he looked away

12

before Speltz began the second weld, Lewis is "kind of looking at me and shakes his head and goes, Purge. I should fill this tank [with] nitrogen. And my instinct was I – I just said, What? And at that point [Speltz] struck up the second tack and then it exploded.

Lewis testified:

> A. And [Posusta] looked over at me and says, "This isn't really that flammable is it?"
> Q. And what did you say?
> A. And I said, 'Well, you should at least have that purge in there. That pipe that's laying there, there's a hose, there's tubing laying there. You should [have] at least thrown that in there."
> Q. What does that do?
> A. Then you could turn nitrogen on, to put a nitrogen blanket, at least on the topside.
> Q. What did he say?
> A. He didn't say anything because at that point [Speltz] struck his next arc.

In *Crawford*, the supreme court concluded that an inspector at a highway-project worksite was not engaged in a common activity with the contractor's employees who were repairing the road. 239 Minn. at 21, 57 N.W.2d at 654. The court explained:

> [T]he plaintiff as an inspector herein was not engaged in the performance of the project. When he found a defect, he performed no services to correct such defect. Correction work was left entirely to employees of the company. Obviously plaintiff is not barred from prosecuting a common-law action against the company.

*Id.* (footnote omitted).

Although Lewis said that the tank should be purged, he did not do anything other than observe and tell Posusta what should have been done. He did not place the hose in the tank or stop Speltz from beginning the second tack weld. Under *Crawford*, Lewis's

13

statement that the tank should be purged was insufficient by itself to establish as a matter of law that Lewis was engaged in the activity of welding. Because there was conflicting evidence as to whether Lewis was otherwise engaged in the activity of welding, the district court did not err in concluding that a fact issue existed on whether Interplastic and Egan employees were engaged in a common activity.

*Same or similar hazards*

"The same or similar hazards requirement does not demand exposure to identical hazards, only similar hazards." *Olson v. Lyrek*, 582 N.W.2 582, 584 (Minn. App. 1998), *review denied* (Minn. Oct. 20, 1998). "In determining whether workers are exposed to similar hazards, [courts] make a comparison of the general risks to which workers are exposed as a result of the tasks being performed." *Id.* "The focus . . . is not on the instrument that caused the injury. It is the exposure to common hazards, not their mutual creation, which makes the election of remedies provision applicable." *Id.* (quotation omitted).

Whether Interplastic and Egan employees were subject to the same or similar hazards depends on Lewis's participation in the welding activity. Because there is conflicting evidence on that issue, the same-or-similar-hazards element cannot be determined as a matter of law.

Because there is conflicting evidence on the facts material to determining whether a common enterprise existed, we affirm the district court's denial of Interplastic's summary-judgment motion.

**Affirmed.**

14

**JOHNSON**, Judge (dissenting)

I respectfully dissent from the opinion of the court. The applicable caselaw leads to the conclusion that Interplastic and Egan were engaged in a common enterprise as a matter of law such that Interplastic is entitled to summary judgment.

The opinion of the court conducts a thorough and detailed review of the evidence in the summary-judgment record. Such a review inevitably reveals discrepancies in various witnesses' recollections and characterizations of the historical facts. When viewed from the proper perspective, however, the undisputed facts of this case are very much like the facts of cases in which the supreme court and this court have concluded that the requirements of the common-enterprise test were satisfied, and very much unlike the facts of cases in which the requirements were deemed not satisfied. The supreme court has instructed the lower courts that the common-enterprise analysis is not overly concerned with minor differences in the factual record. In *O'Malley v. Ulland Bros.*, 549 N.W.2d 889 (Minn. 1996), the supreme court affirmed a district court's grant of summary judgment on a company's common-enterprise defense by saying, in essence, that the material facts are undisputed and the disputed facts are immaterial. *Id.* at 890 & n.1. That is true as well in this case.

The supreme court has set forth the three requirements of the common-enterprise test: "'(1) The employers must be engaged on the same project; (2) The employees must be *working together* (common activity); and (3) In such fashion that they are subject to the same or similar hazards.'" *Id.* at 894 (quoting *McCourtie v. United States Steel Corp.*, 253 Minn. 501, 506, 93 N.W.2d 552, 556 (1958)). The district court concluded

that none of the three requirements are satisfied. I would conclude that all three requirements are satisfied.

## 1. Same Project

The record plainly shows that Speltz, Posusta, and Lewis were working jointly on a project to re-route the return line to the top of the PA tank. In many common-enterprise cases, the first requirement is conceded by the plaintiff, undisputed on appeal, or easily resolved. *See, e.g.*, *LeDoux v. M.A. Mortenson Co.*, 835 N.W.2d 20, 22 (Minn. App. 2013) (conceded); *Olson v. Lyrek*, 582 N.W.2d 582, 584 (Minn. App. 1998) ("no dispute"), *review denied* (Minn. Oct. 20, 1998); *Sorenson v. Visser*, 558 N.W.2d 773, 775 (Minn. App. 1997) (analyzed in one sentence); *Ritter v. M.A. Mortenson Co.*, 352 N.W.2d 110, 113 (Minn. App. 1984) (same). In this case, however, the district court reasoned that Speltz and Posusta were not working on the same project as Lewis because "the PA project did not jointly involve Egan and Interplastic in a meaningful way."

The district court's characterization of the record is inconsistent with the undisputed material facts. The respective employees of Interplastic and Egan collaborated closely to re-route the return line to the top of the PA tank. Three workers (Speltz and Posusta for Egan; Lewis for Interplastic) worked side by side for more than three days and almost completed the project. It is immaterial whether Lewis's supervisor specifically assigned each of the particular tasks that Lewis performed, and it is immaterial which of the three men performed which tasks. What is material is that the three workers consistently worked as a coordinated, interdependent team to achieve their common goal.

D-16

Two supreme court opinions illustrate the set of facts necessary to defeat the first requirement. In *Gleason v. Geary*, 214 Minn. 499, 8 N.W.2d 808 (1943), a contractor was hired to replace a concrete floor at a poultry facility. *Id.* at 501, 8 N.W.2d at 809. An employee of the poultry producer was injured while walking through the concrete work to get to her worksite. *Id.* The supreme court reasoned that the "'chicken picker' was clearly not engaged in anything relating to the repair work" and, thus, not working on the same project as the employees of the contractor. *Id.* at 509, 8 N.W.2d at 813. In *Crawford v. Woodrich Constr. Co.*, 239 Minn. 12, 57 N.W.2d 648 (1953), the injured plaintiff was a state employee who was responsible for inspecting the work done on a road-building project. *Id.* at 17-18, 57 N.W.2d at 652. The supreme court reasoned that the injured state employee and the contractor's employees "clearly were not engaged in the same project" because the plaintiff merely was ensuring that the state "is getting the quality of services for which it has obligated itself to pay under a construction contract." *Id.* at 21, 57 N.W.2d at 654. In both *Gleason* and *Crawford*, it was relatively obvious that the two groups of employees were not engaged in the same project. In this case, however, the facts are very different, for the reasons stated above.

Thus, the district court erred by concluding that the respective employees of Interplastic and Egan were not engaged on the same project.

## 2. Working Together (Common Activity)

Whether the second requirement is satisfied is the closest of the three issues in this appeal, yet it still is clear that the requirement is satisfied. The district court reasoned that Speltz and Posusta were not working together with Lewis on the ground that, at the time

of the explosion, Speltz and Posusta were engaged in the activity of welding, while Lewis was not. In my view, the evidence recited by the majority opinion, when considered in light of the applicable caselaw, shows that Speltz and Posusta *were* working together with Lewis during each of the steps necessary to re-route the return line to the top of the PA tank.

The district court's analysis is necessarily inconsistent with opinions of the supreme court and this court. In *O'Malley*, the supreme court concluded that the second requirement was satisfied despite the fact that, at the time of the plaintiff's injury, two workers employed by two different companies were performing distinctly different tasks on a road-building project. 549 N.W.2d at 895-96. The injured worker, O'Malley, was driving a dump truck that was hauling sand to fill in excavated areas. *Id.* at 892. The worker who allegedly caused his injury was operating a road grader to make the new sand level and occasionally to give a push to dump trucks that had became stuck in the sand. *Id.* When O'Malley's dump truck became stuck, the other worker used the road grader to push O'Malley's dump truck in a way that injured him. *Id.* The supreme court noted that the two companies coordinated their work and that their respective employees "were engaged in activities together throughout the summer, exchanging equipment and seeking advice from the supervisors of both employers." *Id.* at 896. Because the two workers in *O'Malley* were not performing exactly the same task at the time of the injury, it is inappropriate to apply such a requirement in this case.

The district court's analysis also is inconsistent with this court's opinion in *Sorenson*, in which this court concluded that the second requirement was satisfied even

D-18

though two workers employed by different companies were performing different tasks. 558 N.W.2d at 774-76. The worker alleged to have caused Sorenson's injury was digging a trench with a backhoe. *Id.* at 774. Sorenson was standing in the trench, uncovering a water line by hand and instructing the backhoe operator. *Id.* Sorenson was injured when a large chunk of soil fell from the side of the trench. *Id.* We affirmed the district court's conclusion that the second requirement was satisfied even though the two "had distinctly different functions" on the ground that "their duties were interdependent." *Id.* at 776. Again, because the two workers in *Sorenson* were working together in a common activity despite having "distinctly different functions," *id.*, it is error to conclude in this case that the working-together requirement is not satisfied simply because the workers were not performing the same task at the time of the injury.

The key to the second requirement is interdependence. In *O'Malley*, the supreme court explained that "[w]orking together requires that the activities of the employees be more than 'overlapping minimally'; they must be 'interdependent.'" 549 N.W.2d at 895 (quoting *Schleicher v. Lunda Constr. Co.*, 406 N.W.2d 311, 313-14 (Minn. 1987)). In this case, there is abundant undisputed evidence, as reflected in the majority opinion, that the three employees (Speltz and Posusta for Egan; Lewis for Interplastic) were working together in a coordinated and interdependent way in the common activities that were necessary to re-route the return line to the top of the PA tank. For example, Speltz, Posusta, and Lewis each used various tools on June 9 to unclog the PA system. As another example, in preparing for the final step in the project, Lewis and Posusta each had a role in removing the tank cover and preparing it to be replaced. Specifically, Lewis

sprayed the cover with lubricant and readied a drill press; Posusta drilled the hole in the cover. The men's work was at least as interdependent and intertwined, if not more so, than in *O'Malley* and *Sorenson*.

The opinion of the court relies on *Crawford*, the case of the state employee responsible for inspecting a road-building project. *See* 239 Minn. at 17-18, 57 N.W.2d at 652. In that case, the supreme court effectively decided the common-enterprise issue at the first requirement by concluding that the injured plaintiff and the employees of the contractor were not working on the same project. *Id.* at 21, 57 N.W.2d at 653-54. It naturally followed that the second requirement also was not satisfied; the plaintiff and the contractor's employees could hardly be working together on a common activity if they were not working on the same project. *See id.* For that reason, *Crawford* does not support the position that the second requirement is not satisfied.

Thus, the district court erred by concluding that the respective employees of Interplastic and Egan were not working together in a common activity.

### 3. Same or Similar Hazards

There is no basis in the caselaw or in the record for the conclusion that Speltz, Posusta, and Lewis were not exposed to "the same or similar hazards." *See O'Malley*, 549 N.W.2d at 896. The district court reasoned that the respective employees of Interplastic and Egan were not exposed to the same or similar hazards because Lewis's duties did not match those of Speltz and Posusta. That reasoning conflates the third requirement with the second requirement. It is undisputed that all three men were injured in the explosion, albeit to varying degrees. Regardless whether Lewis was engaged in the

D-20

activity of welding or some other activity, the three workers were exposed to the same hazard because each worker was present at the same location and actually was injured by the same manifestation of the same hazard at the same moment in time.

Speltz argues in his brief that the employees were exposed to different risks because he and Posusta were exposed to the typical hazards of welding, such as eye damage and lung damage, while Lewis was not. This argument is beside the point because those hazards are not the hazards that gave rise to Speltz's injury. In addition, at oral argument, Speltz's counsel suggested that Lewis was exposed to a different hazard because he was a few feet further away from the top of the tank than were Speltz and Posusta. That argument is unconvincing because it would require an extremely narrow understanding of the word "similar."

The caselaw illustrates the expansiveness of the third requirement. In *O'Malley*, the two workers occupied two different vehicles; an employee of one company used a road grader to push or bump a dump truck driven by an employee of another company. 549 N.W.2d at 892. Nonetheless, the supreme court reasoned that the hazards to which the two workers were exposed, "while not identical, were sufficiently similar to satisfy the third factor." *Id.* at 897. In this case, the Speltz, Posusta, and Lewis were exposed to hazards that were practically identical. Thus, the district court erred by concluding that the respective employees of Interplastic and Egan were not exposed to the same or similar hazards.

For the above-stated reasons, I would conclude that all three requirements of the common-enterprise test are satisfied. Thus, I would reverse the judgment of the district court and remand for entry of summary judgment in favor of Interplastic.